I think we're all ready for you. Good morning, your honors. My name is Tim Kingston. I'm here on behalf of Appellant Daryl Yurek and if it please the court and counsel. Your honors, I would submit that the first question presented by Mr. Yurek's appeal was a legal one, and that is whether the correct measure of loss that was applied by the sentencing court, that is the amount that the that is the amount that was set forth in his bankruptcy schedules, should be the measure of loss, and that was approximately 1.26 million, or whether the correct measure of loss is the amount of assets that the appellant hid or were hidden or concealed by him from the bankruptcy trustee, from the IRS perhaps, in the offer and compromise proceedings that are in the record in the court. The district court determined with approximately 1.019 million. I would submit that this is a legal issue, but the court should review de novo in this appeal. Well, counsel, let me ask you this, because looking at your brief and trying to put the combination of what they had and what they subtracted and everything, as I read what the district court did when he finally got through with all the different additions and everything, he said it's a difference without a distinction. It's still between the 550,000, I think, and the 1.2 million, and after all that reading, I'm sitting there looking at it, and I think, okay, counsel, explain to me why the district court didn't get that right after looking at all of that math and everything. Well, I absolutely agree, and what the appellant, what I'm arguing on behalf of the appellant is that the measure of loss, the initial measure of loss, or the way the court ought to look at it is what were the, what was the value of the assets that were hidden by the appellant, and I believe that there's case law that supports that conclusion, which I cited in my brief and I can discuss today, and if you go to the next step of the argument, which is did the district court, was its determination the factual issue of whether the mortgage payments that were made by the entity of veracity consultants for the Denver loft were those properly included as hidden assets and countable against the appellant, and whether the down payment that was made by the appellant's son, Justin Yurick, whether that was properly and correctly included as a hidden asset. Okay, that 1.2 million, am I understanding you're arguing that that was improperly included, and if so, why? The cases that I've cited, Holdhouse, which also cited the Wielden case, and the unpublished decision of this court in U.S. versus Brown. I'm not concerned about an unpublished opinion. I understand. They reached the conclusion that in a case like this, a bankruptcy fraud case, that the correct measure of loss ought to be the amount of assets that were hidden by a person, by a defendant, and that's the conclusion they reached. Holdhouse goes into a pretty extended analysis of, let's look at all of the various pieces of property that the appellant, the defendant in that case hid, and to me, that case is on all fours with this case. The government's case, the nine days of alleged to be the various pieces of property, various items of income that this defendant, Mr. Yurick, and I suppose his wife, Wendy Yurick, who we'll hear from later on today, that they took pains to conceal from either the bankruptcy court or bankruptcy trustee in their bankruptcy case or from the IRS as well. Where I'm trying to get you to go for me is that the 1.2 million on the loss, that seems to be the big dollar. Tell me exactly your argument as to why the 1.2 million shouldn't be considered, and I think that's where you're going, but I want to hear the specifics of why the court should not have considered that. Well, I believe it's that second measure of loss, the amount of assets hidden, and that number was 1.019 and change million dollars. That's what the district court determined, and in that figure, in other words, I believe that the 1.2 measure was legally incorrect and should not be followed by this court. Rather, as a district court did, and as I've noted in the brief, that the court looked at it under two measures. I argue that the second measure, the amount of assets hidden, should apply, and if you deduct from that amount, the 1.019 million, the 500 and change, thousand and change for the mortgage payments that were made by veracity consultants, and the 102,000, that was the down payment for the loss. If you deduct those, you come up, that number is 399,000 and change, and that is below, that would only mean that you had 12 levels rather than 14, as the district court did. There were other adjustments, which we're not arguing, I'm not arguing today, that applied sophisticated means, etc., but if you only apply 12 additional levels, you're at level 24, not 26, that yields a different potential sentence in the case. So you have to prove two things. First, as a matter of law, that you should look at hidden assets, not the intended benefit, and secondly, that the assets hidden were not as large as the district court thought, and you've got to knock that, so you've got a factual and a legal issue at hand. Yes, and you've got to win both of them, but if we just go back to Guideline 2B1.13A, it says the test is, loss is, the greater of the actual loss or the intended loss. I don't see either of those options relating to the amount of assets hidden. It doesn't say the assets hidden or the intended gain, it says the greater of the actual loss to the defendant, the government, or the intended loss to the government. Well, the actual loss to the government was, they give this guy a tax refund of over a million dollars. Oh, he never got a refund. I beg your pardon? He never received a refund. Well, I know, not a refund, I mean, but a discount off of his debt. Yeah, yeah. So if we forget all, how do you just get around that language that one of the tests is the actual loss to the defendant, and the actual loss was the government gave up a tax claim of roughly a million dollars, how do you just get around that? I don't think that the government ever actually suffered a loss in this matter, as I've tried to make clear in the brief that a debtor in a bankruptcy case lists every possible debt that he or she might have, and here that's what the debtors did, that amount was approximately $1.2 million, and through my own experiences handling bankruptcy cases, you tell your client to put everything in there contingent to actual, to fix, to every possible debt that you possibly can so that you can receive a discharge with regard to those, and the IRS here never, the government, never actually suffered a loss in the amount of $1.2 on their tax debts, which have grown from, with the additions of interest and penalties over the years have grown, and so if there's no actual loss to the government, I would argue that the, you have to look at the intended loss, and that fits, I mean, that's where you lose me, and I don't want you to lose me unless your argument's wrong, I mean, I don't want to be lost just because I'm dense. Are you saying that, that yes, the government lost a tax claim for about $1 million, but that wasn't a real loss to the government because they never could have collected because it would have been discharged in bankruptcy in any event, but then we have to ask, would it have been discharged if proper disclosures had been made? Is that the trail you're going down? I think either one could apply, Your Honor. But those are the trails you're going down. Yes. Is there any third trail that I'm missing? Not that I can think of off the top of my head. Okay. So the government had a claim, made a claim, didn't collect on that claim. But that claim isn't, the fact that the government didn't collect on that claim isn't a loss because it was discharged or it couldn't have been collected or some other reason. Right, and it didn't affect the debtors' insolvency with regard to any matter here, and that's another point that the hold that if a fraud, bankruptcy fraud, and a tax claim eliminates the government's ability or impairs the government's ability to get a claim, but that claim never could have been recovered because the defendant was a deadbeat always, that that's not been a loss by the government because they had lost it anyhow because he was a deadbeat. Do you have any claim, any arguing case on that? I don't, Your Honor, and as I pointed out in the brief there, it appears to me, at least from my ability to do legal research or lack thereof maybe, that there's a positive legal precedent in this area. But that's your argument now to us? Yes. Okay. Thank you. All right. What about 2B1.1, the definition of intended loss as the pecuniary harm that the defendant purposely sought to inflict, and that includes intended pecuniary harm that would have been unlikely or impossible to carry out. How do you overcome the language in 2B1.1? Well, to me, Your Honor, the pecuniary loss was directly tied to the amount of assets that Mr. and I suppose Mrs. Yerrick, I'm not arguing on her behalf, intended to hide from the government. And again, just to come back to Judge Baldock's question, I believe that the district court was clearly erroneous to include, based on the facts in the case, the mortgage payments and the down payment. What about this vantage point that he sought to, he intended to discharge $1.2 million in debt because that's what he had listed. Three months earlier, he and his wife had signed a contract to purchase a loft for $1.3 million, which one could reasonably infer that if three months earlier they thought that they could afford a $1.3 million loft, that they had sufficient assets three months later to pay the $1.2 million that they were intending to discharge. And there was, of course, a finding that he would not be able to discharge it, the $1.2 million, but that goes to actual loss, not intended loss. Why isn't that, just from a common sense standpoint, an intent to cause a loss to the government of $1.2 million because they recognized that they had the assets to pay for $1.3 million in a loft? Well, I don't know if directly responsive, because maybe I don't 100% understand your question, but certainly... Well, don't answer a question you don't understand. Well, let me take a stab at it, and if I'm in the wrong area, I know you'll correct me. Yes, they'd made a $1.3 million offer, which I want to get to that strongman argument that the government makes in a moment, but certainly that loft doesn't have that value to them at that time. In other words, whatever equity they might have in that property, they were going to pay for it through mortgage payments, which is ultimately what happened here. So, in other words, it's not like an asset that's sitting there that's worth $1.3 million to these debtors, and that would be actualized in their bankruptcy case if the trustee were to liquidate that property. So, that would be my response to your question. I hope it does answer your question. It does. Okay. With regard to the strawman issue, there was lots of evidence, I accept, that was presented at trial about what was the relationship between Justin Uric, the son, and his father in relation to both that purchase and the businesses, the Veracity Consultants and the other businesses that they had some interest in. But at the end of the day, yes, his parents had lived in that because there was an IRS lien that was impairing their creditworthiness. So, their son bought it, and he testified directly, and it's uncontradicted, that he bought it both because he wanted to be a good son, he wanted to help out his parents, and it was a good investment for him because he could write off the interest on it. And he signed an affidavit saying that he bought it because he was intending to live there. I'll just be straight forward. That takes me, counsel, that takes me, if you were reading on a clean slate of how you envision the facts, that's one way. But what do you do with the facts that the court found in all of these instances? I had a hard time finding where the facts helped you in any place. If I may ask, Your Honor, are you referring specifically to the question of mortgage payments? I'm referring to your case, the facts that are there that we're looking at, and how we review the findings that the trial court made, or the bankruptcy court made in this. I just didn't see where you got help anywhere. Now, where did you get help? I'm not arguing in this case that the conviction, I know my colleague is, the sufficiency of the evidence. I'm not arguing the facts dealing with the mortgage and the down payment. As how it relates to getting you a reduction from one point to another in regards to the sentence. And that's, help me, all I can say is help me. At the end of the day, it was Justin Urich that signed the contract to buy that property. At the company, yes, his father had some involvement with it, but it was Justin Urich's company that made the mortgage payments for that property. At the end of the day, it was Justin Urich who sold that piece of property and I think took a loss on it. So those are, to me, the operative facts that are of most importance here and most important for the court's consideration. So I see my time is up. Okay, thank you. Thank you, Your Honors. Thank you. May it please the court. Counsel. Peggy Ryan for the United States. I'd like to begin with asking this court to cite an opinion or author an opinion in which it comes out swinging that the amount of discharge tax is the appropriate measure of loss in a case like this where the facts are as extensive as they are. This is not a case like Holthaus or Brown where there were charged under 18 U.S.C. 152 certain specific identifiable assets that weren't disclosed. This is much more like the Ninth Circuit's Bussell case where we have an entire scheme that lasted a decade and more where they hid assets, they hid income, they hid his status as the CEO which was neither an asset or an income but it was a type of status that would give him access to things like executive loan programs and by lying about that they were trying to cut off the investigator at the pass, the revenue officer, from even discovering what they could investigate as far as ways to figure out how to collect that tax. So this is not a case where we should be looking at the specific concealed assets that can be tallied. Instead like Bussell we should look at the scheme that is lengthy, it is orchestrated, it involves more than one participant and acknowledge that the entire goal of this defendant was to deprive the IRS of its entire tax which was 1.2 million dollars as the district court found. How do we how do we know they intended to escape the entire 1.2 million as opposed to simply hoping to shave 500,000 haircut or 900,000 or a million haircut? Where did they say that they were trying to get out of the entire tax liability? Daryl Yerrick in particular said that during his rule 2004 exam when he said specifically that his purpose in filing for the bankruptcy was to avoid the 1.2 million that the IRS wanted. Okay, thank you. Additionally you know it helps the evidence about the concealed assets and the volume of them does help show that the entire intent was the full 1.2 million because this wasn't a disparity of a concealed asset that was worth 80,000 for a 1.2 million dollar tax gain. This was over 500,000 mortgage payments, over 100,000 in the down payment on the loft, 100,000 dollars for vacation homes, 90,000 dollars for country club memberships, 26,000 dollars for the car that Wendy Yerrick owned. So all of those while the government doesn't believe that should be the measure of specifically quantifying the massive amount of concealment shows that the goal was the whole loss. Do you think would the government ever argue that the measure of amount of damage could be the concealed assets or I mean you're saying here it shouldn't be here it should be the intended loss but are you saying intended loss is always the test or are you saying that sometimes concealed the value of the concealed assets could be the measure? Your honor I believe the measure of concealed assets under the right factual circumstances could be the measure of the intended loss but that would have to be. But only if but but I mean it's you have to still anchor it to the intended loss. I mean when I read the the guideline it says greater of actual or intended loss to the defendant. I don't see anything in there about greater of the concealed assets or the loss. It all focuses on the defendant and then the second part of that is it includes intended harm to the defendant. So all of those seem to focus on the defendant's harm not anything on the assets concealed. I mean so I'm surprised you are telling me now this is all academic to this case but I'm surprised you're telling me that you could think there would be appropriate times when just the concealed assets might be the proper measure. Well certainly if the charge came under the concealed assets charge in one in section 152 and that is a very different set. Oh a different set a different IRS claim. A different bankruptcy counter. A bankruptcy claim yeah. And that that was the section that was charged in both the where the government had charged specifically the concealment of identified assets. Right but then but for IRS it wouldn't ever be an IRS claim but but it could be a concealed bankruptcy asset claim of course. Yes your honor and if if this involved the IRS but the facts were very different I believe there could be a circumstance where looking at the facts. Well you've clarified my question thank you. Thank you but here where the in the conduct is so pervasive and so long and is to such a degree that quantifying each and every lie told is actually quite difficult. Even the list that we came up with that was set forth in front of the district court sentencing was not the entire amount. We did not quantify the amount of shares that Mr. Europe withheld because at that point it was a very difficult quantification. There was arguments about the value of the shares. What date that should be used. Whether they were still restricted. It's hard to quantify everything that's concealed but when the entire goal is to cut off the entire amount of tax that's owed that is the best measure. And frankly we could use the guidance from the 10th circuit that that is an allowable measure and that would help district courts going forward. I would encourage the court to follow the 9th circuit's precedent and bucel understanding that it's only persuasive precedent but I feel that the facts are very similar to this case regarding the length and complexity and reasons why the full measure is the entire discharge tax. If the court instead decided to go to the factual analysis of the concealed assets this district court properly considered the amounts of the loft payments in those concealed assets. The facts before that court gave it ample opportunity especially under the preponderance standard to purchase the loft as a straw purchase for the benefit of his parents. And the record specifically stated in fact Justin Urick himself testified that Darrell Urick was not simply a figurehead at Veracity. He was the CEO. He was in charge of the day-to-day operations regarding financing including supervising the CFO. He also supervised Justin Urick himself. The idea that he didn't have the ability to direct and control the payments that Veracity made toward his personal expenses is not supported by the record. And certainly this district court in finding that he did is not clearly erroneous. And the district court made that factual finding at the supplemental volume 1 pages 27 through 28 as well as page 95. It found that Darrell Urick had the ability and did in fact direct and control those payments. Well counsel let me ask you this. Based upon the evidence that we have and what the district court did, as I understood what he said, it doesn't make any difference as to which way I go. This is it. Why should we do more into a specific holding than just answer the question of did the trial court actually err by just saying hey there's not a hell of beans of difference in this case as to what happened. Certainly your honor we believe the sentence should be affirmed in any event. But we'd ask for the guidance by the 10th circuit. There is a lack of 10th circuit precedent interpreting title 18 United States. I'm always leery of what I ask for because I might get it. And so that's I just I'm always leery of doing more than what I have to do particularly from the bench. So I appreciate that. I'm still shooting for the stars and hoping that the court is willing to offer an opinion regarding section 157 specifically because again there is a lack of published opinions interpreting that section. And it would be helpful for district courts and counsel going forward to have that available. If the court, I would just like to cite a couple of the factual issues that are in dispute because opposing counsel said it wasn't contradicted that Justin Urecht bought this as an investment. It absolutely was contradicted. He admitted that he did no analysis to figure out what his finance costs would be in purchasing this loft. And he had mortgages totaling of almost certainly over 1.1 million dollars at high interest rates at least by today's standards over six percent apiece. One of them was seven percent. That's a significant finance cost. And if you truly are a piece of property in the hopes of it appreciating to your benefit over a period of time, the first step any real real estate investor would have done was to figure out whether those finance costs would eclipse any expected profit you would have. He did no such analysis which belied his claim that this was an investment for him. The Urechts also paid no rent to him for more than four years despite the fact that they claimed they were renting it. And they came up with that false lease agreement which purported to be signed shortly after Justin Urecht supposedly purchased this loft but in fact could not have been signed for at least an additional six months because it's cited as a contact address for Justin Urecht, a property that he hadn't yet purchased. So that was a false lease agreement again underscoring the fact that this relationship was a cover story for the true ownership of the loft. Also the occupancy affidavit that was primary residence, it also specified it wasn't being purchased as an investment and that it would not be leased. And Wendy Urecht signed that as the attorney in fact for Mr. Urecht on that during the refinancing transaction. And the purchase of the loft was negotiated exclusively by Daryl Urecht. If Justin Urecht had really taken this over as his own investment, he would have become involved in that negotiation because it would have directly impacted him. But as a his father handled the transaction because it belonged to his father. And if there are no further questions, I would yield the remainder of my time. Thank you. Thank you. Okay, thank you. This matter will be submitted.